693 A.2d 149

WILLIAM FROST AND BARBARA FROST, HIS WIFE, PLAIN-TIFFS–APPELLANTS, v. DR. STEPHEN BRENNER AND ES-TATE OF JOHN HUBBARD, DEFENDANTS–RESPONDENTS, AND DR. EUGENE GORMAN AND PASCACK VALLEY HOSPI-TAL, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued March 4, 1997—Decided May 5, 1997.

Before Judges DREIER, D'ANNUNZIO and NEWMAN.

*Richard Seltzer* argued the cause for appellants (*Mr. Seltzer* and *Frederick L. Woeckener,* on the brief).

*George J. Kenny* argued the cause for respondent Dr. Stephen Brenner (*Connell, Foley & Geiser,* attorneys; *Mr. Kenny,* of counsel and on the brief).

*William S. Mezzomo* argued the cause for respondent Estate of Dr. John Hubbard (*McDonough, Korn, Eichhorn & Boyle,* attorneys; *James R. Korn,* of counsel; *Mr. Mezzomo,* on the brief).

The opinion of the court was delivered by

D'ANNUNZIO, J.A.D.

Plaintiffs appeal from an adverse judgment in this medical malpractice case. The case was tried against Dr. Stephen Brenner and the Estate of the late Dr. John Hubbard. Plaintiffs presented two claims: deviation and informed consent. At the conclusion of plaintiffs' case, the court dismissed the informed consent claim on the ground that plaintiffs' proofs had failed to quantify the relevant risks and, therefore, the jury would be unable to determine whether the reasonably prudent patient would have submitted to surgery in light of the relevant risk. The court also dismissed the claim against Hubbard on the ground that Hubbard had been a consultant and not a treating physician. Consequently, the case was submitted to the jury solely on the deviation claim against Brenner. The jury determined that Brenner had not deviated from the applicable standard of care.

In May 1990, plaintiff[1], William Frost, was employed as a carpenter by a furniture manufacturing company. At that time, he was attempting to lift a 'four by eight' piece of fiberboard when he experienced low back pain. A chiropractor treated Frost for six weeks while Frost continued to work. Frost's health insurer,

---

[1] Use of the noun "plaintiff" in the singular refers to William Frost.

however, required that he see a medical doctor because he was not improving. The first doctor Frost consulted recommended immediate disc surgery. Plaintiff felt that immediate surgery was premature, and he asked for a second opinion. The second physician also told Frost that he needed surgery. Frost sought a third opinion from his family physician, Dr. Samarsinghe. The family physician admitted Frost to the Pascack Valley Hospital on August 20, 1990 for testing and diagnosis. Upon admission to the hospital, Frost came under the care of defendant, Dr. Brenner, an orthopedic surgeon.

During his August admission, treatment consisted of traction and epidural steroid injections. Frost obtained no relief from these procedures. He testified that his pain increased. Consequently, Brenner and Hubbard performed disc surgery on August 28, 1990.

Frost and Brenner disagreed regarding the immediate impact of the surgery. According to Frost, after the surgery he woke up and had a lot of pain and a "fierce" urge to urinate. The next day Frost told Brenner and Hubbard that his right big toe was numb and he had a tingling in the calf muscle of his right leg. According to Frost, he had no toe numbness before surgery, but he did have calf tingling before surgery. Frost said that he was released two days after the surgery and that he was in "bad shape" as far as lower back pain. He had no leg pain, however.

Frost testified that he experienced increasing urinary frequency, but he did not tell Brenner about the problem because he did not believe it had any connection with his back condition. He thought it would go away. Brenner became aware of the urinary problem after Frost mentioned it to his physical therapist. Brenner immediately referred Frost to Hubbard, whom Frost saw on November 13. Hubbard ordered an MRI, which was performed on November 14. As a result of his exam and the MRI, Hubbard was concerned about the recurrence of disc fragments at the site of the August surgery, that is, at L4–L5 and L5–S1. Hubbard's

differential diagnosis also included the possibility of scar tissue and spinal instability as potential sources of Frost's complaints.

Brenner also referred Frost to a urologist, Dr. Berdini, whom he saw on November 19. Berdini's diagnosis was that of a neurogenic bladder. Brenner admitted Frost to Pascack Valley Hospital on November 21, 1990.

Brenner testified that he and Hubbard removed herniated discs at L4–L5 and at L5–S1 during the August surgery, and that the surgery "freed up the nerve roots." Brenner stated that immediately after surgery, Frost experienced dramatic improvement. His leg pain was gone the first day. According to Brenner, the primary purpose of the surgery, elimination of pain and ambulation without cane or walker, was accomplished. Brenner testified, however, that Frost continued to have sensory loss around the L5–S1, S2 and S3 nerve roots. He described it as a "spotty loss." Brenner stated that pressure on the spinal nerves by a herniated disc damages those nerves. He explained that relief of the pressure eliminates the existing pain and that one then hopes that the nerve repairs itself. He cautioned, however, that more often than not the sensory function does not return.

Brenner testified that after the August surgery he saw Frost on November 5, 1990, October 1, 1990, October 22, 1990 and November 7, 1990. On November 7, Frost told Brenner that he had leg pain and tingling on the outside part of the right foot. Frost also told Brenner that he was leaking urine. Brenner then ordered Hubbard's examination and the urological consultation.

After the examinations by Hubbard and Berdini, Brenner admitted Frost to the hospital on November 21 for testing, including x-rays, bone scan, myelogram, MRI with catolinium enhancement, and abdominal and pelvic CAT scans. According to Brenner, these diagnostic procedures did not indicate a need for surgery. He did note, however, that they demonstrated a lot of scarring which he characterized as more scarring than might normally be seen. Brenner noted that some people develop more scarring from surgery than other people. He also testified that the lumbar

CAT scan noted a *left* side change at L5–S1, which was felt to be a small disc herniation. He also considered spinal instability as a cause of Frost's developing problems because two discs had been removed without fusing the affected vertebrae. Consequently, Brenner ordered a brace to stabilize the motion in Frost's lower back.

Brenner testified that he discharged Frost on December 1, 1990, but saw him again on December 10. At that time, Frost complained of significant lower back pain, "popping," and tingling and numbness in his right leg. On December 10, Brenner considered surgery to re-explore the lower spine, remove scar tissue, remove any other disc material, and perform a spinal fusion of the two vertebrae. Brenner and Hubbard performed the surgery on January 8, 1991. They found massive scarring which they described as very, very scarred. Brenner stated that because of this massive scarring, he and Hubbard had to use a special retractor to hold back all the tissue. They found a large amount of scar tissue around the L5 nerve root on the right side. They also found what he characterized as a "tiny disc fragment" at a nerve root angle. They removed the disc fragment and some other fragments between the bone. Brenner and Hubbard also performed a fusion of L4 and L5.

Frost's condition improved for about six days but then deteriorated. It is not contested that Frost is impotent, and severely disabled with low back pain and partial paralysis of his lower right leg.

During his testimony, Brenner attributed Frost's condition to the redevelopment of scar tissue. He noted that a June 1991 MRI was consistent with extensive epidural scarring, but without evidence of recurrent disc material.

Dr. Newirth, a New York orthopedic specialist to whom Brenner referred Frost, concluded that no further surgical intervention was indicated because it would not help. According to Newirth, plaintiff was disabled and should be in a pain program. Newirth opined that plaintiff's problem was due to "severe arachnoiditis

and epidural fibrosis." Brenner explained that arachnoiditis is an inflammation and scarring of insulating material that encases the spinal cord. Fibrosis means scarring.

Dr. Rubacky testified as an expert witness on behalf of plaintiff. He testified that in November 1990, Frost was suffering from cauda equina syndrome (CES). He described the cauda equina as a group of nerves at the base of the spinal column which resemble the hairs of a horse's tail (in Latin, cauda equina means horses tail). CES is the result of something pressing on the cauda equina, such as a tumor or a disc.

Rubacky testified that after disc surgery one can get a recurrent disc problem, that is, disc material at the site of the prior surgery. Rubacky testified that a recurrent disc is in itself *not* malpractice. He testified that it is an accepted risk of disc surgery. According to Rubacky, in November 1990, plaintiff was experiencing progressive paralysis. He was getting worse neurologically. Rubacky described it as a "classical textbook partial cauda equina syndrome." Rubacky testified that the November tests provided "unequivocal evidence that the cause of the cauda equina syndrome was a recurrent disc that was pressing on the nerve."

Rubacky stated that the standard of care dictated immediate surgery in November 1990 to decompress the spinal cord and increase neurological response. Brenner and Hubbard, according to Rubacky, waited too long. They should have operated in November instead of waiting until January. He opined that CES is caused 90–95% by recurrent disc material and not by scar tissue.

Regarding proximate cause, Rubacky testified that if plaintiff had been operated on in November, he probably would have had, at the very least, a partial recovery of his paralysis and maybe a complete recovery. Rubacky also testified that Brenner had deviated during post-August visits by not asking about urinary frequency and by not doing neurological exams. Rubacky praised Hubbard's November 13, 1990, examination and report. He testi-

fied that on November 13, Hubbard did what Brenner should have done.

Plaintiffs contend that the judgment in favor of Brenner on the deviation claim should be reversed because the trial court precluded an attempt to cross-examine defendants' medical expert regarding his "commonality of insurance with defendant doctors." Plaintiffs also contend that defense counsel's reference to a learned treatise which was not in evidence requires reversal. We have carefully reviewed the record and we conclude that these contentions are clearly without merit. *R.* 2:11–3(e)(1)(E).

■ We agree with plaintiffs' contention that the trial court should not have dismissed the deviation claim against Hubbard. The evidence would have supported the jury's determination that Hubbard was a treating physician of Frost along with Brenner[2]. On this record, however, we are persuaded that a new trial as to the deviation claim against Hubbard is unnecessary. Rubacky's primary target was Brenner. Although a fair reading of Rubacky's testimony places the blame on Brenner and Hubbard for their failure to operate in November, Rubacky also found fault with Brenner's failure to inquire regarding neurological function and an alleged failure to perform neurological tests between Frost's discharge from the hospital in August and the date Brenner referred Frost to Hubbard. Similarly, Rubacky praised Hubbard's examination and analysis as the result of Hubbard's November 13 examination of Frost.

Rubacky made no distinction between Hubbard and Brenner, regarding the deviation claim, in terms of their roles or standard of care. Rubacky never testified or suggested that Hubbard had the greater duty because he was a neurosurgeon while Brenner

---

[2] Brenner's testimony after plaintiff had rested confirmed the evidence introduced on plaintiffs' case. Brenner testified that "this was a coordinated treatment.... The standard in the hospital ... is that if spinal surgery is necessary both the neurosurgeon and an orthopedic surgeon participate in the care of the patient." He also testified that the orthopedic surgeon cuts through skin and muscle "till we get to the actual spine.... Then the neurosurgeon takes over."

was an orthopedic surgeon. There is nothing in the record that would support a finding that Brenner had not deviated, while Hubbard had deviated. We conclude, therefore, that the jury's determination that Brenner had not deviated also exonerated Hubbard. *Cf. Blonder–Tongue Labs., Inc. v. University of Illinois Foundation,* 402 *U.S.* 313, 328, 331, 91 *S.Ct.* 1434, 1442–1443, 28 *L.Ed.*2d 788, 799–800 (1971) (permitting defendant to utilize doctrine of issue preclusion to estop plaintiff from asserting claim against him in which plaintiff had previously litigated and lost against another defendant); *E.I.B. by I.J. v. J.R.B.,* 259 *N.J.Super.* 99, 611 *A.*2d 662 (App.Div.), *certif. denied,* 130 *N.J.* 602, 617 *A.*2d 1223(1992) (mother's unsuccessful paternity action barred subsequent action under New Jersey Parentage Act in name of child); *Moore v. Hafeeza,* 212 *N.J.Super.* 399, 405, 515 *A.*2d 271 (Ch.1986) (natural mother's claim for paternity and support, which was subsequently brought after similar action by county board of social services in which mother participated, was barred by doctrine of issue preclusion). Consequently, we affirm judgments in favor of Brenner and Hubbard on plaintiffs' deviation claim.

As previously indicated, the trial court entered judgment in favor of defendants on the informed consent claim. Consequently, the record contains only evidence produced on the plaintiffs' case. That evidence includes a document, P–1, consisting of a Pascack Valley Hospital form. Apparently, it consists of one sheet of paper with text on both sides. It is divided into part A, entitled "Consent to Operation, Anesthesia, Special Treatment or Procedures." Part A consists of eight numbered paragraphs and is continued on the back of the form. Frost's signature appears at the bottom of Part A, after paragraph eight, and a physician's signature appears below Frost's. Presumably, this is Brenner's signature. Below Brenner's presumed signature is part B, which is titled "Hospital Confirmation of Consent." Part B is dated August 28, 1990, the date of the surgery, at 3:10 p.m. It is signed by Frost and, as a witness, by nurse Sullivan.

Paragraph three of part A contains printed language which states: "I have been made aware of certain risks, hazards, complications and consequences that are associated with the above operation, treatments and procedures, as well as possible alternative modes of treatment." Following this printed text, there is handwriting stating "death, paralysis, infection, failure surgery (indecipherable), blood loss, AIDS, increased pain and suffering."

Frost testified that during his hospitalization, Brenner told him that the surgery was a "fairly simple procedure" and involved a small incision two to two and a half inches. Brenner told Frost it was very similar to arthroscopic knee surgery. Frost related to this analogy because he previously had experienced arthroscopic knee surgery. Frost testified that Brenner did not mention any dangers.

According to Frost, Brenner never told him of the risks and never reviewed P-1 with him. Frost testified that on the day of the surgery, he received a Demerol injection at 9:30 a.m. The surgery was scheduled for 4:30 p.m. At 2:30 p.m., he was in the visiting room with his wife when a nurse told Frost that he was wanted in the operating room right away. Frost was put in a surgical gown, placed on a gurney and received an injection in each buttock. He was then wheeled to the operating room.

Frost testified that Dr. Gorman, the anesthesiologist, noted that he saw no permission slip. Frost testified that he had not signed a permission slip up to that time. According to Frost, nurse Sullivan produced a consent form (P-1 in evidence) and Frost signed it at 3:10 p.m., but he did not read it.

On cross-examination, Frost testified that he was not aware of the risks of the surgery, and that when he signed P-1, the nurse showed him only one side of it. Frost reiterated his testimony that he had been told that the surgery would be simple and quick like his previous knee surgery.

On re-direct, Frost testified that he never discussed the risks of the August surgery with Brenner. Brenner never told him that

he could get worse and suffer paralysis. According to Frost, if Brenner had told him about those risks, he probably would have said no to the surgery. Frost testified that he was working at his job up to the August surgery despite his problems.

Plaintiff called nurse Sullivan as a witness. She had no recollection of the Frost surgery. She looked at P–1 and acknowledged that she had signed it as a witness.

The plaintiff also called as a witness Ms. Voorman–Fish, the hospital's vice president in charge of nursing. She testified that "the purpose of section B is for the nurse to attest and to assure from the patient that indeed it was his signature." We infer "his signature" refers to the patient's signature at the bottom of section A.

In *Largey v. Rothman,* 110 *N.J.* 204, 540 *A.*2d 504 (1988), our Supreme Court reformulated the elements of a malpractice action based on the lack of informed consent. Under *Largey,* plaintiff must establish that the risk of the injury which plaintiff claims to have sustained as a result of the surgical procedure would have influenced a prudent patient in reaching a decision on whether to submit to the surgery. If so, then the physician deviated from informed consent standards if the physician had not advised plaintiff of that risk. *Id.* at 212–14, 540 *A.*2d 504. Additionally, plaintiff must establish causation, that is, that "the prudent person in the patient's position would have decided differently if adequately informed." *Id.* at 215, 540 *A.*2d 504 (quoting *Perna v. Pirozzi,* 92 *N.J.* 446, 460 n. 2, 457 *A.*2d 431 (1983)).

In the present case, as previously indicated, plaintiff's expert witness, Rubacky, testified that a "recurrent disc" pressing on the nerves in Frost's lower back caused Frost's symptoms and that a "recurrent disc" is an accepted risk of disc surgery. Thus, plaintiff established by Rubacky's expert opinion, if believed by the jury, that the risk of exacerbated symptoms, including paralysis, was one of which Brenner and Hubbard should have been aware, and that it was recognized as a risk within the medical community. *See Febus v. Barot,* 260 *N.J.Super.* 322, 327, 616 *A.*2d

933 (App.Div.1992); *Calabrese v. Trenton State College,* 162 *N.J.Super.* 145, 156, 392 *A.*2d 600 (App.Div.1978), *aff'd,* 82 *N.J.* 321, 413 *A.*2d 315 (1980). Ironically, Rubacky's testimony in this regard is corroborated by the informed consent form, P–1, which in a handwritten addendum describes various risks, including paralysis and increased pain and suffering.

The trial judge, however, granted judgment to defendants on the ground that plaintiff had failed to prove causation, that is, that the prudent person in Frost's position would have foregone the surgery if he had been adequately informed. The trial court, raising the issue *sua sponte,* ruled that plaintiff was obligated to prove the statistical risk of the post-surgical consequences he suffered.

No party has cited a reported opinion requiring a plaintiff in an informed consent case to produce evidence of the statistical risk of a particular surgical consequence. We have found none. In *Johnson v. Kokemoor,* 199 *Wis.*2d 615, 545 *N.W.*2d 495 (1996), however, the Wisconsin Supreme Court ruled that the statistical risk of morbidity and mortality from a certain type of brain-aneurysm surgery was admissible on plaintiff's case. *Id.* 545 *N.W.*2d at 506–08. The court cautioned that "whether statistics are sufficiently material to a patient's decision to be admissible and sufficiently reliable to be non-prejudicial, are best resolved on a case-by-case basis." *Id.* at 508. Conceding the admissibility of statistical risk under certain circumstances as relevant and reliable, we are persuaded that such statistical evidence is not an indispensable requisite of plaintiffs' cause of action in this case.

To establish the cause of action, plaintiffs had to prove that defendants did not adequately disclose risks which would materially affect a prudent patient's decision to undergo a medical procedure. *Largey* defined a material risk. the Court stated:

A risk would be deemed "material" when a reasonable patient, in what the physician knows or should know to be the patient's position, would be "likely to attach significance to the risk or cluster of risks" in deciding whether to forego the proposed therapy or to submit to it.

[*Largey, supra,* 110 *N.J.* at 211–12, 540 *A.*2d 504 (quoting *Canterbury v. Spence,* 464 *F.*2d 772, 787 (D.C.Cir.1972), *cert. denied,* 409 *U.S.* 1064, 93 *S.Ct.* 560, 34 *L.Ed.*2d 518 (1972)).]

We have held that expert testimony is necessary to show "that the risk was one of which the physician should have been aware, and that it was recognized within the medical community." *Febus, supra,* 260 *N.J.Super.* at 327, 616 *A.*2d 933. However, "no medical expert is required to prove that an undisclosed risk would have been material to the patient's consent." *Ibid.* As previously indicated, the evidence adduced on plaintiff's case was sufficient to withstand a defense motion for a directed verdict on those issues.

We also are persuaded that the evidence was sufficient to withstand a similar motion on the separate issue of causation. Causation is established if a prudent person in Frost's position would have declined treatment if he had been informed adequately of the risk that resulted in post-surgical harm. *Largey, supra,* 110 *N.J.* at 216, 540 *A.*2d 504. Plaintiffs presented evidence sufficient to establish materiality, as defined in *Largey.* That evidence was also probative on the causation issue; it went a long way toward establishing causation. Frost supplemented the evidence of materiality, that is, Rubacky's testimony and the handwritten addendum to P–1, when he testified that he was able to work and was still working up to the August hospitalization. A jury could have determined, without statistical evidence, that a prudent patient who was then capable of working, would have foregone the surgery to avoid the material risk of increased pain and potential paralysis from a recurrent disc.

We conclude that evidence of the statistical risk of post-surgical harm was not an essential element of plaintiffs' cause of action. We, therefore, reverse the judgment on the informed consent claim and remand for a new trial regarding that claim. We affirm the judgment in favor of Brenner and Hubbard on the deviation claim.