766 A.2d 1147 (1998)
337 N.J. Super. 220
Antonio SGRO and Ermelinda Sgro, his wife, Plaintiffs-Appellants,
v.
Richard S. ROSS, M.D., Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted October 27, 1998.
Decided November 24, 1998.
Angelo J. Falciani, Woodbury, for appellants (Mr. Falciani and D. Marie Harrison, on the brief).
Paarz, Master, Koernig, Crammer, O'Brien, Bishop & Horn, Cherry Hill, for respondent (Timothy M. Crammer, on the brief).
Before Judges MUIR, EICHEN, and COBURN.
PER CURIAM.
Plaintiffs appeal from a judgment dismissing their medical malpractice complaint entered after a jury decided defendant had not failed to secure the informed consent of his patient, Dr. Antonio Sgro. They contend the trial court erred when it submitted the informed consent issue to the jury, and further erred when it improperly charged the jury on informed consent. We find no error and affirm.
Plaintiff Dr. Antonio Sgro, an insulin-dependent diabetic who at the time was 66 years old, consulted defendant ophthalmologist Richard S. Ross when the vision in *1148 plaintiff's right eye became blurred. An examination disclosed the right eye visual acuity as 20/200. Plaintiff suffered from cataracts in the right eye. After consultation, plaintiff opted to have a lens implant, a procedure Ross described as "standard."
The lens implant was initially successful. Plaintiff told defendant his vision was "clear, crystal clear." Several days after the surgery, plaintiff experienced eyelid swelling. Defendant told plaintiff to change prescribed eye drops and call him if anything worsened.
On December 10, 1991, plaintiff appeared for a regularly scheduled examination. At that time, defendant found the suture holding the implant had unraveled, but the implant was secure with only a slight peaking of the pupil. Defendant gave plaintiff instructions on use of prescribed drops and scheduled him for a return exam in a week.
On the evening of December 12, 1991, plaintiff experienced some difficulty with the eye. He felt a sense of wetness and his vision suddenly blurred. Since it was late in the evening, plaintiff went to bed. The next day, the wetness remained and the vision seemed more blurred.
Defendant saw plaintiff around 11:30 a.m. that next day. A portion of plaintiff's iris had prolapsed; the iris had pushed out through the incision made at the time of the cataract operation. One expert, who testified at trial, stated the prolapse probably occurred between 11 and 11:30 p.m. the night before. No other expert took issue with that opinion.
Given the prolapse, the absence of any necrotic (unhealthy) tissue, and the absence of conjunctiva on the iris, defendant concluded the prolapsed iris should be reposited rather than excised. Defendant testified that, because the prolapsed iris tissue appeared healthy and it was less than 24 hours old, he was required to reposit the iris back into the eye. Defendant told the jury he did not inform plaintiff about excision of the iris because it was not an option in this case. Excising the prolapsed section of the iris would have caused plaintiff to suffer from light sensitivity, double vision, and night glare.
Defendant informed plaintiff that he was going to fix the prolapse. Plaintiff testified that defendant did not tell him how he was going to fix it. Both plaintiff and defendant testified that defendant did not inform plaintiff as to any alternative procedure for repairing the prolapse. Plaintiff also testified that defendant did not inform him of any possible risks that might be involved.
Upon completion of the reposit operation, defendant ordered plaintiff to put drops of the antibiotic Chibroxin on the surface of his eye. Plaintiff followed his instructions.
On the evening of December 16, 1991, plaintiff experienced an "annoying sensation," which worsened during the night. By the morning, the pain was worse and plaintiff was experiencing double vision. The next day, plaintiff kept a previously scheduled appointment. The defendant's examination disclosed increased inflammation in the eye. Defendant arranged for plaintiff to see Dr. Gary Brown of the Wills Eye Hospital the next morning.
Dr. Brown, after an examination, concluded plaintiff had fulminant endophthalmitis. The doctor hospitalized plaintiff. During the hospitalization, Dr. Brown performed several operative procedures. Dr. Brown testified he suspected the bacteria causing plaintiff's endophthalmitis was introduced into plaintiff's eye at the time the iris prolapse was repaired.
At trial, plaintiffs presented one expert, Dr. Philip Shelton. Dr. Shelton testified that the iris could have been excised and that repositing was riskier because of the chance of infection but, if repositing was chosen, antibiotics should be used to reduce the chance of infection. The focus of Dr. Shelton's testimony related to defendant's alleged malpractice for allowing the infection to occur. The jury rejected plaintiffs' claim and that issue is not before us. On cross-examination, Dr. *1149 Shelton testified that, even though what defendant did was risky, it was acceptable and he was not saying that defendant should not have done it.
Dr. Raymond Adams, an expert for the defense, testified that if the prolapse had occurred less than 24 hours before and it was not covered with conjunctiva, then it was "probably wise to go back and to reposit it back into the eye to repair this prolapse." Dr. Adams also testified that there were a number of factors, other than cosmetic problems, that would make a doctor choose not to excise.
Another defense expert, Dr. Michael Weiss, testified that when dealing with a non-traumatic iris prolapse of less than 24 hours, the standard of care is to reposit the iris. He also testified that with a prolapse of under 24 hours just about every doctor reposits. Dr. Weiss agreed that, according to medical literature, if the prolapse is less than 24 hours old and not necrotic, the proper thing to do is reposit and not excise.
The trial court instructed the jury on the issue of informed consent as follows:
Question number seven, .... Did Dr. Ross fail to obtain Dr. Sgro's informed consent to repair the prolapsed iris? All right. Now, let me talk to you about informed consent, all right? Before a physician may operate upon or otherwise treat a mentally competent adult patient, the physician must first get the patient's informed consent, that is, a doctor, before performing an operation or subjecting the patient to a course of treatment, has a duty to explain in terms understandable to the patient what he proposes to do. The purpose of this legal requirement is to protect each person's right of self-determination in matters of medical treatment. The only exceptions to that requirement of our law would be the happening of an emergency or the development during surgery of an unforeseeable condition, neither of which is the case here. The physician's duty is to explain in words the patient can understand that medical information and those risks which are material. Medical information or a risk of a medical procedure is material when its nature is such that in the circumstances... a reasonable patient would be likely to attach significance to it in deciding whether or not to submit to the treatment. To establish that the physician is responsible for any injuries suffered, the plaintiff must prove that the physician's communication was not adequate. The circumstances include what the physician knows or should know to be the patient's medical [injuries] or condition. The physician is not required to disclose to the patient all the details of the proposed operation or treatment, or all the possible risks, no matter how small or remote. Nor is the physician required to communicate those dangers of which persons of average sophistication are aware, or those dangers the patient has already discovered. Taking into account what the physician knows or should know to be the patient's [informational] needs, that is, and you have to realize, of course, that Dr. Sgro is a medical doctor, the physician must make reasonable disclosure of that information and those risks which a reasonably prudent patient would consider material or significant in making the decision about what course of treatment, if any, to accept. Such information would generally include a description of the patient's physical condition, the purposes and advantages of a proposed surgery or treatment, the material risks of the proposed treatment, and the material risks if such surgery or treatment is not provided, as well as the available options or alternatives and their advantages and risks.
Here, the plaintiff alleges that Dr. Ross failed to advise him on December 13, 1991 that cutting off the prolapsed iris was an alternative to putting the prolapsed iris back into place. And that had he been so informed, he would have chosen to have the prolapsed portion of the iris excised. If you find that (1) the defendant, Dr. Ross, failed to comply *1150 with the applicable standard for disclosure, that is, failed to give the plaintiff all the information that a reasonable person in the patient's position would expect a doctor to disclose in order that the patient might make an informed decision; (2) that undisclosed risk occurred and harmed the plaintiff; (3) a reasonable person, under the circumstances of this case, would not have consented and submitted to the operation or surgical procedure had he been so informed; and (4) that the operation or surgical procedure was a proximate cause in producing the plaintiff's injuries or conditions, then your verdict must be for the plaintiff on this issue. Although the plaintiff's testimony may be considered on the question as to whether he would have consented, the issue to be resolved is not what this plaintiff would have done. What [you] must decide is whether a reasonably prudent person would not have consented to having the iris put back in the eye, but provided with material information which you find the physician failed to provide in this case. If, however, you find that the defendant, Dr. Ross, gave all the information which a reasonable person in the patient's, Dr. Sgro's, position would expect to receive at the time the consent was given, or that the undisclosed risk did not occur, or that some information was omitted or not disclosed, but such information would not have caused a reasonable patient to refuse consent to the procedure or operation, or that any failure on Dr. Ross' part to comply with the applicable standard for disclosure was not a proximate cause of the plaintiff's injuries or condition, then your verdict should be for the defendant on this issue.
You have heard testimony regarding whether it was proper to reposit the prolapsed iris on December 13, 1991, in other words, to put the iris back into the eye, or whether it was necessary to cut off the prolapsed portion. The testimony was relevant only on the issue of whether Dr. Ross obtained the plaintiff's informed consent to reposit the prolapsed iris. There is no claim in this case that it was negligent or deviation from the standard of care for Dr. Ross to reposit the iris.
You may recall that Dr. Shelton, plaintiff's expert, testified that in his opinion, the only negligence that occurred on December 13, 1991 was the failure to inject antibiotics at the end of the iris prolapse repair. Thus, the testimony about repositing as opposed to cutting off the prolapsed iris may be considered by you only in determining whether the alternative of cutting the iris off was material information in connection with the plaintiff's informed consent claim, that is, would a reasonable, prudent patient have expected to be told about the alternative under the circumstances of this case, and would a reasonable prudent patient have elected to have the iris cut off under the circumstances of this case.
The jury answered "no" to question seven. The trial court entered judgment dismissing the complaint, and this appeal ensued.
Plaintiff first contends the issue of informed consent was a matter of law for the court to decide and not one for the jury to decide. We disagree.
Largey v. Rothman, 110 N.J. 204, 540 A.2d 504 (1988), set a new course for the informed consent doctrine. It established that "the standard of informed consent related to the patient's needs, not the physician's judgment." Niemiera v. Schneider, 114 N.J. 550, 565 n. 4, 555 A.2d 1112 (1989). It adopted the "prudent person" or "materiality of risk" standard espoused in Canterbury v. Spence, 150 U.S.App.D.C. 263, 464 F.2d 772 (D.C.Cir.), cert. denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972). The Canterbury court held the duty to disclose risks involved as part of a medical treatment had to be measured by the needs of the patient; therefore, information that is material to and would affect the patient's decision *1151 must be disclosed. Canterbury, supra, 464 F.2d at 786-87. "`[A] risk is thus material when a reasonable person, in what the physician knows or should know to be the patient's position, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed [medical treatment].'" Id. at 787 (quoting Waltz & Scheuneman, Informed Consent to Therapy, 64 N.W.U.L.Rev. 628, 640 (1970)). As the Largey Court noted, Canterbury drew no bright line in separating significant risks from insignificant ones, but resorted to a rule of reason "concluding that `[w]henever non-disclosure of particular risk information is open to debate by reasonable-minded-[persons], the issue is one for the finder of facts.'" Largey, supra, 110 N.J. at 213, 540 A.2d 504 (quoting Canterbury, supra, 464 F.2d at 788).
The trial court properly presented the informed consent issue to the jury. Unlike Caputa v. Antiles, 296 N.J.Super. 123, 686 A.2d 356 (App.Div.1996), certif. denied, 149 N.J. 143, 693 A.2d 112 (1997), relied upon by plaintiffs, the expert testimony did not support a conclusion there were two alternative treatments available. Defendant's experts essentially told the jury repositing the iris was the only viable procedure under the circumstances. Plaintiffs' expert did not deny repositing was the proper procedure. Even so, plaintiff had testified he would have opted for excision had he been told about it. Implicit in that representation is that he was willing to risk double vision, night blindness, and light sensitivity. As a consequence, the informed consent issue focused on whether the nondisclosure of excision, with its attendant risks, was something material, something a reasonable person in plaintiff's position would have been likely to attach significance to, in deciding whether to opt in favor of the excision. It was a context that required consideration as to whether the failure to disclose excision as an alternate remediation dealt with a significant or insignificant risk. It was a decision, sufficiently open to debate, to require submission to the jury.
Finally, we find plaintiffs' charge issue to be clearly without merit. See R. 2:11-3(e)(1)(E). The informed consent charge was a complete statement of the law appropriate to the case and the factual issue before the jury. See Jurman v. Samuel Braen, Inc., 47 N.J. 586, 591-92, 222 A.2d 78 (1966). The charge had no capacity to mislead the jury. See Vallejo by Morales v. Rahway Police Dep't, 292 N.J.Super. 333, 342, 678 A.2d 1135 (App. Div.), certif. denied, 147 N.J. 262, 686 A.2d 763 (1996). Indeed, it thoroughly informed the jury on controlling principles of law so as to enable it to perform its functions. See State v. Green, 86 N.J. 281, 287-88, 430 A.2d 914 (1981).
Affirmed.