787 A.2d 910 (2002)
346 N.J. Super. 256
Edward T. BLAZOSKI and Maureen Blazoski, his wife, Plaintiffs-Appellants,
v.
Steven S. COOK, M.D., Defendant-Respondent, and
Jeffrey Wint, M.D., Robert Wood Johnson University Hospital, Acromed, Inc., National Medical Specialty, as successor in interest to Stuart, Inc., Sofamor S.N.C., and Sofamor Danek, Inc., Defendants.
Superior Court of New Jersey, Appellate Division.
Argued October 29, 2001.
Decided January 2, 2002.
*913 Michael S. Berger, Haddonfield, argued the cause for appellants (Andres & Berger, attorneys, Mr. Berger and Kevin Haverty, on the brief).
Jeremy P. Cooley, Lawrenceville, argued the cause for respondent (Lenox, Socey, Wilgus, Formidoni, Brown, Giordano & Casey, attorneys; Mr. Cooley, on the brief).
Before Judges HAVEY, BRAITHWAITE and WEISSBARD. *911
*912 The opinion of the court was delivered by HAVEY, P.J.A.D.
In this medical malpractice case, judgment was entered on a no-cause jury verdict in favor of defendant Stephen S. Cook, M.D. The central issue raised on appeal is whether a surgeon must inform a spinal-fusion patient that the internal fixation device he intends to utilize during surgery was not approved by the Federal Food and Drug Administration (FDA) for use on the lumbar spine. Plaintiffs argue that because defendant failed to disclose the absence of FDA approval in this case of "pedicle" screws, Edward T. Blazoski (plaintiff) did not give an informed consent to the surgical procedure as a matter of law. Plaintiffs therefore challenge the denial of partial summary judgment as to liability, their motion for a directed verdict at the close of the case, and their motion for a new trial.
We affirm. We hold that the doctrine of informed consent did not require defendant in this case to advise plaintiff of the FDA regulatory status of the pedicle screws.
Plaintiff was sixty-seven years of age at the time of trial. In 1975, he suffered from spondylolisthesis, and underwent a decompression and spinal fusion at the L-4/5 level performed by Dr. Joseph Zawadsky. In 1980, he underwent a second spinal fusion at the L-3/4 level. In 1990, plaintiff was examined by Dr. Zawadsky on several occasions after he injured his back while at work. A myelogram and CAT scan revealed that plaintiff had a narrowing of the spinal canal and disc herniation at the L-2/3 level. Plaintiff was referred to defendant, part of Dr. Zawadsky's group. Defendant is an orthopedic surgeon specializing in spinal surgeries.
*914 After defendant examined plaintiff and various diagnostic test results, plaintiff signed an "informed consent" form on October 31, 1990, stating that defendant proposed to perform a "revision lumbar laminectomy, fusion, and internal fixation." The form contained a "Physician Certification," which stated that the physician has "specifically discussed the more common risks of this procedure, the nature and purpose of this procedure, and the possible alternative methods of treatment." The certification further provided that the physician has advised the patient "that the potential benefits of this procedure outweigh the potential risks" but that the patient may seek out "second opinions." Finally, it stated that the "possible complications" discussed with the patient are "those which I consider to be the most common ones...." Plaintiff signed the form, acknowledging he had "read the physician's certification ... and agree[s] that the information referred to in it has been discussed with me, and that I have been given the opportunity to ask further questions about any areas which were not clear to me."
The spinal fusion was performed at Robert Wood Johnson University Hospital on November 20, 1990. During the operation defendant found that there was a nonunion at the L-3/4 level. Defendant decided to utilize an internal fixation device. He performed laminectomies at the L-2/3 level, removed the disc herniation and released the nerve roots. He then grafted bone and after bridging the bone between the L-2/3 level, he placed two screws into the pedicles of L-2 and two screws into the pedicles of L-4 and connected the bridging rods. The screws utilized by defendant are referred to as "pedicle" screws because they are implanted into the pedicle, part of the vertebra, to achieve fusion.[1] The apparatus was then secured by locking nuts to hold the bars and vertebrae in place.
After the surgery plaintiff experienced "jabbing pains" and spasms in his back, numbness and weakness in his legs and a pulsating feeling in his buttocks. According to plaintiff he felt metal in his back moving and heard a clicking sound. Eventually, x-rays were taken which revealed that a locking nut had come off one of the pedicle screws and there was motion of the fixation device at the L-3/4 level. When plaintiff's pain worsened, he was examined by Dr. R. Bruce Heppenstall, an orthopedic surgeon who admitted plaintiff to the University of Pennsylvania Hospital where the internal fixation device was removed. Dr. Heppenstall located the free-floating locking screw that was buried in plaintiff's tissue and removed it. However, he left part of a broken screw in plaintiff's back because it was buried in bone near the spinal cord and nerve root.
Prior to trial, defendant admitted that at the time of plaintiff's surgery, the FDA classified pedicle screw systems as Class III devices, "experimental devices of unproven safety and efficacy." Defendant also acknowledged that he was aware in 1990, when plaintiff's surgery was performed, that the FDA had not approved the use of pedicle screws for use in locations other than the sacrum, the location for which the screws were originally designed. Defendant was also aware that the FDA had approved a few hospitals across the country to experiment with the insertion of the screws in patients' pedicles. The institutions involved in this study used a particular informed consent form that described the use of these screws as experimental.
*915 During trial, plaintiff testified that defendant told him he was "going to put a fusion and rods" in his back. Plaintiff acknowledged that he fully understood the meaning and purpose of a fusion and how fusion surgery is accomplished because he had undergone two such prior procedures in the past, and his wife had undergone spinal fusions as well. Plaintiff testified that he assumed that fusion was always successful. He stated that when he asked defendant to explain about the "rods," defendant stated "I've got to put rods in your back, they'll be in there forever, you'll never know they're there, and you'll feel like a new man."
Plaintiff claimed that defendant did not tell him anything about the risks of the surgery or that he planned to put screws in plaintiff's back. He also stated that defendant did not offer him any alternatives to surgery. Nevertheless, plaintiff admitted that he knew from his prior conversations with Dr. Zawadsky that he could refuse to have surgery and continue with conservative treatment. Plaintiff agreed to the spinal fusion surgery because he trusted defendant's judgment in view of defendant's association with Dr. Zawadsky. Plaintiff Maureen Blazoski, Edward's wife, verified plaintiff's testimony that the only information defendant gave him about the proposed surgery was that he planned to fuse plaintiff's spine and insert rods.
Plaintiff testified that he would not have allowed defendant to place the pedicle screw fixation device into his back if he had known that the FDA had classified the use of pedicle screws as "experimental" and that the screws could break or that the locking nuts could loosen. He added that if he had known that pedicle screws were to be utilized he would not have undergone the surgery because he was aware that screws can break from his thirty years of experience in working with hardware.
Lawrence I. Barr, D.O., plaintiffs' liability expert, testified that the risks associated with the use of pedicle screws during spinal fusion include the increased risk of infection, fracture of the pedicle bones, damage to the nerve root and failure of the internal fixation device, that is, the screws, bolts, nuts and rods. Dr. Barr explained that if the patient fails to develop a solid fusion, or if the screws or rods loosen, the internal fixation device can be painful because of the abnormal motion occurring at the fusion site.
Defendant's version of plaintiff's preoperative visits to his office differed markedly from plaintiff's account. He testified that he obtained plaintiff's history and performed a physical examination on plaintiff's first visit on October 1, 1990. He reviewed with plaintiff the results of his myelogram and CAT scan, advised plaintiff that he was suffering from a compression of the nerve probably related to a disc problem and that his condition was worsening. He also explained that any surgical procedure in removing the disc would be complicated because defendant did not know the exact origin of plaintiff's pain; it could have been from disc impingement, arachnoiditis changes or "from the mechanical problems of his back...."
Defendant discussed with plaintiff the nature, purpose and benefits of the surgery he proposed and its alternatives. He explained the possible need to decompress all of the nerves in the L-2/3 level, the possibility of risk of injury to the nerve, and that the process of decompressing the nerve might cause instability to the joint and thus, plaintiff would most likely need a fusion. He specifically advised plaintiff that he could continue conservative treatment with medication and physical therapy. However, he explained that physical *916 therapy would not work well because it will tend to aggravate the condition.
Defendant explained to plaintiff that one of the available alternatives was to have a fusion without the insertion of an internal fixation device. Defendant stated that he would like the option of using an internal fixation device if he felt during the operation that it was necessary to help achieve a full fusion. He explained the device to plaintiff as consisting of two screws and connecting rods that would act as an internal splint to stabilize the vertebrae while fusion takes place. He stated that using internal fixation for stabilization was a "new approach" when plaintiff questioned him about it because plaintiff's two prior fusions had not utilized internal fixation.
Defendant also testified that he told plaintiff about the "general risks" of the technical aspects of inserting an internal fixation device, but did not mention specific risks such as spearing a nerve or a blood vessel with a screw because defendant had never had this happen in any of his surgeries. He acknowledged that he did not give plaintiff the percentage rate of success of the surgery he was proposing because there was no reliable literature that gave concise figures on the success/failure rate of a fusion using an internal fixation device with screws in a patient who had had multiple prior back surgeries. However, defendant claimed that he gave plaintiff information as to the relative risk factors of the recommended surgery, limited to the risks defendant thought were important, that is, the major ones and those that were common.
Finally, defendant admitted he did not tell plaintiff that the use of pedicle screws in lumbar fusion surgery had not been approved by the FDA, or that there was any controversy surrounding the FDA's position. He did not do so because it was his view that FDA status was not germane to the medical decision that plaintiff had to make because the FDA regulates manufacturers' labeling, distribution and promotion of medical devices, not the practice of medicine. Defendant had been using pedicle screws since 1987, after learning about their benefits from surgeons participating in spinal surgery at Johns Hopkins Hospital and attending meetings of the North American Spine Society, and other medical groups. He testified that based upon his discussions with colleagues and his attendance at seminars, it was his opinion that the use of pedicle screw fixation was generally accepted in the spinal-surgery community in 1990 as being the strongest available device to assist in achieving spinal fusions by immobilizing vertebral segments.
At the close of the case, plaintiffs moved for a directed verdict as to liability, arguing that plaintiff did not give an informed consent as a matter of law because defendant did not disclose the FDA status of the pedicle screws.[2] They also contended that they were entitled to a liability verdict because defendant admitted he did not advise plaintiff about the risk of breakage of the screws and rods or the risks of damaging bone, nerves and blood vessels. In denying the motion, the trial court stated that the issue of whether any of the nondisclosed information, including FDA investigatory status of pedicle screws, would have been material to plaintiff's consent presented a question of fact for jury determination. It added that defendant's failure to disclose risks that did not occur *917 in this case, cannot provide a basis for finding defendant liable.

I
Plaintiffs' central point is that the FDA investigational status of pedicle screws creates a material risk that, as a matter of law, must be disclosed before a patient gives an informed consent to spinal fusion surgery during which the screws are employed.
Informed consent is a negligence concept predicated on a physician's duty to disclose to his or her patient such information as will enable the patient to knowledgeably evaluate the nature of the treatment and any attendant substantial risks, as well as the available alternative options, risks and likely outcomes of those alternatives, before that patient is subjected to a course of treatment. Matthies v. Mastromonaco, 160 N.J. 26, 35, 733 A.2d 456 (1999); Largey v. Rothman, 110 N.J. 204, 208, 540 A.2d 504 (1988); Perna v. Pirozzi, 92 N.J. 446, 459, 457 A.2d 431 (1983). The standard of informed consent relates to the patient's needs, not the physician's judgment. Niemiera v. Schneider, 114 N.J. 550, 565 n. 4, 555 A.2d 1112 (1989). The doctor's duty of disclosure is measured by the "prudent patient" or "materiality of risk" standard. Largey, supra, 110 N.J. at 212-13, 540 A.2d 504; Posta v. Chung-Loy, 306 N.J.Super. 182, 202, 703 A.2d 368 (App.Div.1997), certif. denied, 154 N.J. 609, 713 A.2d 500 (1998). "[A] physician must disclose to a patient all material information that a `prudent patient' might find significant for a determination whether to undergo the proposed therapy." Niemiera, supra, 114 N.J. at 562, 555 A.2d 1112 (citing Largey, supra, 110 N.J. at 211-12, 540 A.2d 504). This standard is objective. Largey, supra, 110 N.J. at 211, 540 A.2d 504; Battenfeld v. Gregory, 247 N.J.Super. 538, 551, 589 A.2d 1059 (App.Div.1991).
Every risk need not be disclosed. Largey, supra, 110 N.J. at 213, 540 A.2d 504. The test for determining whether a particular risk must be disclosed is its materiality to the patient's decision, i.e., all risks potentially affecting the decision must be divulged. Id. at 211-12, 540 A.2d 504. A risk is "deemed `material' when a reasonable patient, in what the physician knows or should know to be the patient's position, would be `likely to attach significance to the risk or cluster of risks' in deciding whether to forego the proposed therapy or to submit to it." Ibid. (quoting Canterbury v. Spence, 464 F.2d 772, 787 (D.C.Cir.), cert. denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972)).
The plaintiff bears the burden of proving the physician's failure to disclose the risk, as well as the materiality of the risk. Frost v. Brenner, 300 N.J.Super. 394, 405, 693 A.2d 149 (App.Div.), certif. denied, 151 N.J. 471, 700 A.2d 883 (1997). "The medical probability of the risk manifesting in the patient is highly relevant to whether a reasonably prudent patient would consider the risk material or not." Canesi v. Wilson, 158 N.J. 490, 511 n. 5, 730 A.2d 805 (1999). However, there is no bright-line test for separating significant risks from insignificant ones. Rather, whenever nondisclosure of a particular risk is open to debate by reasonable-minded persons, the issue is one for the jury. Largey, supra, 110 N.J. at 213, 540 A.2d 504; Sgro v. Ross, 337 N.J.Super. 220, 226, 766 A.2d 1147 (App.Div.1998), aff'd, 166 N.J. 338, 765 A.2d 745 (2001).
Regulation of medical devices is governed by the Federal Food, Drug, and Cosmetic Act (FDCA), 52 Stat. 1040 (as amended by the Medical Device Amendments of 1976, 90 Stat. 539, 21 U.S.C.A. § 301). Under 21 U.S.C.A. § 360c, Class III devices are those which:

*918 (ii)(I) [are] purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health, or
(II) presents a potential unreasonable risk of illness or injury,
....
[and for which] there is not sufficient information ... to provide reasonable assurance of [the device's] safety and effectiveness [under the general or specific controls applicable to Class I or II devices.]

[21 U.S.C.A. § 360c(a)(C)(ii)(I) and (II).].
Class III devices incur the FDA's strictest regulation and must complete a thorough review process with the FDA before they may be marketed. Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 344, 121 S.Ct. 1012, 1015, 148 L.Ed.2d 854, 858 (2001).
Notwithstanding the marketing and labeling requirements imposed by the FDA, health care providers often employ medical devices for an "off label" use; that is, "for a purpose other than those which appear in the labeling and which have been approved by the FDA." Southard v. Temple Univ. Hosp., 781 A.2d 101, 104 (Pa. 2001). "[O]ff-label" usage of medical devices "is an accepted and necessary corollary of the FDA's mission to regulate in this area without directly interfering with the practice of medicine." Buckman Co., supra, 531 U.S. at 350, 121 S.Ct. at 1018, 148 L.Ed.2d at 862. The FDCA expressly provides that "[n]othing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient ... within a legitimate health care practitioner-patient relationship." 21 U.S.C.A. § 396.[3]
The majority view in other jurisdictions, represented by the recent decision of the Pennsylvania Supreme Court in Southard, supra, 781 A.2d 101, is that the doctrine of informed consent does not require surgeons to advise patients of the FDA investigational status of pedicle screws. As in this case, the defendant surgeons in Southard employed a spinal-fixation device using screws implanted in the pedicle in order to aid spinal fusion. Id. at 103. Plaintiff sued, claiming that defendants failed to obtain his informed consent because they did not tell him prior to surgery that the FDA had classified the pedicle screws as Class III devices. Ibid. Concluding that in informed consent cases "[w]e see no reason to expand the information that surgeons traditionally impart to their patients to encompass a device's FDA regulatory status[,]" id. at 107, the court held:
We agree with the courts in Bone Screw Litigation that "[t]he FDA labels given to a medical device do not speak directly to the medical issues surrounding a particular surgery." 1996 WL 107556 at *3. The category into which the FDA places the device for marketing and labeling purposes simply does not enlighten the patient as to the nature or seriousness of the proposed operation, the organs of the body involved, the disease sought to be cured, or the possible results. The FDA administrative label does not constitute a material fact, risk, complication or alternative to a surgical procedure. It follows that a physician need not disclose a device's FDA classification to the patient in order to ensure that the patient has been fully informed regarding the procedure. Accord Alvarez v. *919 Smith, 714 So.2d 652 (Fla.App. 5 Dist. 1998).

[Ibid.]
See also Klein v. Biscup, 109 Ohio App.3d 855, 673 N.E.2d 225, 231, appeal not allowed, 76 Ohio St.3d 1438, 667 N.E.2d 987 (1996) (holding that the use of bone plates and screws in spinal fusion surgery was not a material risk which need be disclosed to the patient because the FDA does not regulate the practice of medicine, and therefore "the decision ... is a matter of medical judgment, not of regulatory approval").
We endorse the majority opinion as expressed by the court in Southard. Actions for informed consent are limited to the nondisclosure of medical information. James M. Beck and Elizabeth D. Azari, FDA, Off-Label Use, and Informed Consent: Debunking Myths and Misconceptions, 53 Food & Drug L.J. 71, 100 (1998). New Jersey cases have fixed the contours of a patient's informed consent by focusing on the nature of, and risks and benefits of the treatment, the condition the treatment is intended to correct, the availability of other options, and the risks and likely outcomes of those alternatives. Matthies, supra, 160 N.J. at 34-36, 733 A.2d 456 (necessity of explaining medically reasonable invasive and noninvasive alternatives, including the risks and likely outcomes of those alternatives, even when the chosen course is noninvasive); Largey, supra, 110 N.J. at 205, 540 A.2d 504 (necessity of disclosing risks of undergoing a certain biopsy); Caputa v. Antiles, 296 N.J.Super. 123, 133, 686 A.2d 356 (App.Div.1996) (physician must disclose conservative treatment as an alternative to surgery for removal of kidney stone), certif. denied, 149 N.J. 143, 693 A.2d 112 (1997). The issue in such cases is whether the medical information the physician failed to disclose was material to the patient's decision. Largey, supra, 110 N.J. at 211-12, 540 A.2d 504.
In contrast, the FDA regulatory status "`do[es] not speak directly to the medical issues surrounding a particular surgery.'" Southard, supra, 781 A.2d at 107 (quoting In re Orthopedic Bone Screw Products Liability Litigation, No. 1014, XXXX-XXXX, 1996 WL 107556 at *3 (E.D.Pa. March 8, 1996)). In a related context, our Supreme Court in Morlino v. Med. Ctr. of Ocean County, 152 N.J. 563, 706 A.2d 721 (1998), held that the Physician's Desk Reference (PDR), approved by the FDA, does not in itself establish a medical standard of care, in part because "[s]uch an approach ... would be inconsistent with the FDA's position that physicians are not bound by PDR recommendations." Id. at 581, 706 A.2d 721. The Court quoted the forward to the 1997 PDR which advised the following:
The FDA has always recognized that the [Food, Drug, and Cosmetics] Act does not, however, limit the manner in which a physician may use an approved drug. Once a product has been approved for marketing, a physician may choose to prescribe it for uses or in treatment regimens or patient populations that are not included in approved labeling. The FDA also observes that accepted medical practice often included [sic] drug use that is not reflected in approved drug labeling.

[Ibid. (quoting Physician's Desk Reference, Forward (51st ed.1997).]
See also Canesi, supra, 158 N.J. at 512, 730 A.2d 805 ("in determining what constitutes a medically accepted risk when defining a doctor's duty to warn, ... the PDR, standing alone, is not and should not be the touchstone of what risks a physician must reveal to his or her patient").
What is clear is that the FDA's concern is to regulate the marketing and labeling of medical devices, not to intrude upon the practice of medicine or redefine the doctrine of informed consent. *920 Significantly, the FDA does not prohibit off-label use of pedicle screws. In essence, physicians have the right, exercising reasonable medical judgment, to use medical devices for off-label purposes that are not FDA approved, provided that the FDA has approved the device for some other purpose. Staudt v. Froedtert Mem'l Lutheran Hosp., 217 Wis.2d 773, 580 N.W.2d 361, 362-63 (Ct.App.1998). In this case defendant testified, without contradiction, that the use of pedicle screws was generally accepted in the field of spinal surgery in 1990. Of course, "`a physician who engages in off-label uses has the responsibility to be well informed about the device, and to base the decision to use it on sound medical evidence....'" Femrite v. Abbott Northwestern Hosp., 568 N.W.2d 535, 542 (Minn.Ct.App.1997) (quoting FDA document dated February 17, 1994, entitled "Update on the Regulatory Status of Pedicle Screws"). Plaintiffs do not claim in this case that defendant's use of the pedicle screws did not comport with medical standards.
We recognize that the standard of informed consent relates to the materiality of the risk and to the patient's needs, not the physician's judgment. Largey, supra, 110 N.J. at 212-13, 540 A.2d 504; Niemiera, supra, 114 N.J. at 565 n. 4, 555 A.2d 1112. However, we reject plaintiffs' argument that the FDA's Class III classification was medical information concerning a material risk. Not all known information need be disclosed by the physician. Largey, supra, 110 N.J. at 213, 540 A.2d 504. Class III certification is simply "a determination that there was insufficient evidence of safety and effectiveness to warrant FDA approval." Southard, supra, 781 A.2d at 106.
The fact that the FDA had not yet garnered sufficient information in its review process to conclude that there is a reasonable assurance of safety to classify the screws for a particular use is not a qualitative determination that the device is risky or unsafe. See Holland v. Smith & Nephew Richards, Inc., 100 F.Supp.2d 53 (D.Mass.1999) ("The mere fact that the FDA has not cleared a product for a particular use does not mean that the product is not in fact suitable for that purpose; it simply means that the FDA has not cleared it."); Minisan v. Danek Medical, Inc., 79 F.Supp.2d 970 (N.D.Ind.1999) (fact that FDA has not approved device for a particular use does not mean that it is unsafe or defective) (citation omitted). Indeed, the FDA has specifically refuted the claim that it ever determined "that pedicle screw spinal systems present a serious risk of injury." 63 Fed.Reg. 40025, 40031 at ¶ 8.

[Id. at 107.]
We agree.
Further, there are sound policy reasons why the FDA status need not be disclosed. Requiring disclosure may necessitate a pre-surgery discourse by the physician on the mechanics of the FDA approval process which may dilute the significance of material, medical risks related to the procedure.
Patients ... would be distracted from learning about the nature, risks, and benefits of their treatments by regulatory information of de minimus value. Such information would accentuate the errant notion that all off-label use is by definition inherently risky, novel, or investigational. By implying risk or novelty when there is none, these disclosures could frighten patients away from the very therapies that actually are best for the treatment of their conditions.[4]

*921 [Beck and Azari, supra, 53 Food & Drug L.J. at 101.]
Also, disclosure will require the physician to be a student of the cumbersome federal regulatory approval scheme, when the physician's chief concerns are whether the particular device is medically sound considering the specific circumstances of the patient, and that the patient knows of the nature and risks of the operation, the condition intended to be cured, and the availability of other options.
Finally, the fact that hospitals approved to "experiment" with the use of pedicle screws are required to use informed consent forms is not dispositive. Federal regulations requiring that a patient be informed that the medical device is investigational apply only to investigational studies. Southard, supra, 781 A.2d at 107-08. Plaintiff was not enrolled in an investigational protocol when the surgery was performed.
We hold that defendant was not required to disclose to plaintiff the FDA investigational status of pedicle screws in order for plaintiff to have given an informed consent to the surgery. Understandably, in this case the trial court permitted the jury to consider whether the FDA status was material to a prudent patient's decision to undergo the spinal fusion procedure. By its verdict, the jury obviously concluded that it was not.

II
Plaintiffs argue that, aside from the FDA status issue, a directed verdict of liability should have been granted in their favor because defendant failed to disclose the specific risks relating to the use of pedicle screws, namely the possibility of infection, breakage of the screws, damage to the bone and injury to the nerves.
The trial court properly denied the motion on this point. A motion for a directed verdict at the conclusion of the evidence must be denied if the evidence, together with the legitimate inferences to be drawn therefrom, could sustain a judgment in favor of the party opposing the motion. R. 4:40-1; Dolson v. Anastasia, 55 N.J. 2, 5, 258 A.2d 706 (1969). The essence of the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that the party bringing the motion must prevail as a matter of law. Brill, supra, 142 N.J. at 536, 666 A.2d 146. Thus, "if, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied." Dolson, supra, 55 N.J. at 5, 258 A.2d 706 (citations omitted).
Defendant admitted during cross-examination that he did not advise plaintiff of the specific possible risks associated with the use of pedicle screws. However, he testified that prior to the surgery he discussed with plaintiff the nature, purpose and benefits of the procedure and its alternatives, including fusion without the insertion of an internal fixation device. He told plaintiff that he would like the option of using an internal fixation device if necessary in order to achieve fusion, and explained the fixation device, including use of pedicle screws that would act as an internal splint to stabilize the vertebrae while fusion takes place. He advised plaintiff *922 that the use of this type of internal device was a "new approach" when plaintiff questioned him about it. Defendant stated that he told plaintiff about the "general risks" of the technical aspects of inserting any internal fixation device, but did not mention specific risks because defendant had never encountered these problems in any of his prior surgeries.
Accepting defendant's testimony as true, and according him all inferences reasonably deduced therefrom, Dolson, supra, 55 N.J. at 5, 258 A.2d 706, reasonable minds could differ as to whether a prudent patient in plaintiff's position would likely not attach significance to the specific information concerning the precise modes of failure and risks associated with the use of pedicle screws.
Plaintiffs also assert that they were entitled to a directed verdict because it is undisputed that defendant failed to inform plaintiff that he was at greater risk for a failed fusion because he was a smoker. Dr. Barr, plaintiffs' expert, testified that patients who smoke or have had prior back surgery have a greater chance of failure to achieve full fusion.
Plaintiffs mischaracterize defendant's testimony. He stated that although he did not discuss the specifics of how smoking can affect a fusion, he told plaintiff that smoking can affect the healing process and therefore advised plaintiff to stop smoking. Since a fusion will not occur if there is a failure to heal, the significance to a prudent patient of defendant's failure to go into specifics is clearly open to debate. Thus, the issue was one for the jury and would have been improper for the court to have directed a verdict on this basis.
Moreover, it is questionable whether defendant had a duty to disclose the risks of smoking to plaintiff for purposes of informed consent. A physician is not responsible for failing to disclose a risk which is not inherent in the procedure. Gilmartin v. Weinreb, 324 N.J.Super. 367, 376, 735 A.2d 620 (App.Div.1999). A risk inherent in a medical procedure means that the risk is one which exists in and is inseparable from the procedure itself. Ibid. The risk that smoking posed was not a risk inherent in the surgery.

III
Plaintiff raises the following additional arguments:

Point IBecause Dr. Cook never disclosed to Mr. Blazoski that the equipment he proposed to use was classified by the FDA as a device of unproven safety and effectiveness and was the subject of controlled studies in which he was not participating, summary judgment on the issue of deviation from accepted standards of care should have been entered before trial.

Point IIThe jury's verdict was clearly against the weight of the evidence and a new trial is necessary to avoid manifest injustice.
We have considered plaintiffs' remaining contentions and supporting arguments and are satisfied the issues are not of sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E); Brill, supra, 142 N.J. at 523, 666 A.2d 146. Dolson, supra, 55 N.J. at 5-6, 258 A.2d 706.
Affirmed.
NOTES
[1] A "pedicle" is defined as "[a] constricted portion of the arch of a vertebra." 4 Schmidt Attorneys' Dictionary of Medicine P-124 (2000). Pedicle screws are implanted in the "pedicle" to aid fusion.
[2] Prior to trial plaintiffs moved for partial summary judgment as to liability, relying on evidential material which established defendant's failure to disclose the FDA status of the pedicle screws and specific risks of potential complications associated with their use. For the reasons expressed in this opinion, we affirm the denial of the summary judgment motion. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 666 A.2d 146 (1995).
[3] New Jersey's Legislature has recognized "off-label" use in the context of prescription drugs, by stating that to require all appropriate uses of a drug to undergo approval by the FDA may deny patients the ability to obtain medically effective treatment. See N.J.S.A. 26:1A-36.9.
[4] The FDA, in the context of instructions accompanying drugs and medical devices, has stated that "`[t]he Commissioner does not believe that a warning or cautionary statement should be required for every possible question that might be raised about the safety of a product. A plethora of warnings about insubstantial questions would be difficult for consumers to evaluate.'" Beck and Azari, supra, 53 Food & Drug L.J. at 101 (quoting 43 Fed.Reg. 1101, 1104 (Jan. 6, 1978)).