781 A.2d 101

**Branes N. SOUTHARD and Deborah Southard, Appellees,**

v.

**TEMPLE UNIVERSITY HOSPITAL and David H. Clements, III, M.D., and William F. Young, M.D.,**

**John Reed, Intervenor.**

**Appeal of David H. Clements, III, M.D. and William F. Young, M.D.**

Supreme Court of Pennsylvania.

Argued Jan. 29, 2001.

Decided Sept. 26, 2001.

336

J. Kurt Straub, Philadelphia, for Temple University Hosp., David H. Clements, III, M.D., and William F. Young, M.D.

Robert B. Hoffman, Harrisburg, for amicus curiae American Medical Assn.

Murray S. Levin, James Michael Beck, Philadelphia, for Medtronic Sofamor Danek, Inc.

Christine Anne Hodson, Daniel F. Ryan, Plymouth Meeting, for amicus curiae Pennsylvania Medical Society.

John P. Kopesky for Barnes and Deborah Southard.

Richard L. Orwig, Reading, for amicus curiae Pennsylvania Trial Lawyers Assn.

Paul E. Peel, Daniel F. Ryan, Plymouth Meeting, for John Reed.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, and SAYLOR, JJ.

## *OPINION*

Justice CAPPY

We granted allocatur limited to the issue of whether the doctrine of informed consent requires surgeons to advise their patients of the Food and Drug Administration ("FDA") regulatory status of a medical device. We conclude that there is no such requirement, and therefore we reverse that portion of the Superior Court's order that held otherwise.

Appellee Branes Southard injured his back at work in 1987 and again in 1989. In October 1992, in an attempt to alleviate Appellee's back pain, Appellants Dr. Clements and Dr. Young at Temple University Hospital implanted a spinal fixation device in order to aid in spinal fusion. As a part of the surgery, the physicians implanted bone screws in the pedicles (i.e., portions of the vertebrae) of Appellee's spine. In May 1994, Appellee underwent explantation[1] surgery to remove the bone screws.

In June 1995, Appellee and his wife, Deborah Southard (collectively "Appellees"), filed a complaint against Appellants, asserting, *inter alia*, that Appellants failed to obtain informed consent from Appellee prior to the surgery. This claim was premised, *inter alia*, on the fact that Appellee was not advised of the FDA regulatory status of the bone screws. Deborah Southard's claim was based on loss of consortium.

Because Appellee's informed consent claim was premised on the device's FDA regulatory status, a brief overview of that classification scheme is necessary. The marketing, labeling and promotion of medical devices for commercial distribution

1. The removal of an implant. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, (29th ed.2000).

such as the spinal fixation system at issue here are regulated by the FDA pursuant to its authority under the Medical Device Amendments ("MDA") of 1976 to the Federal Food Drug and Cosmetic Act ("FDCA"). 21 U.S.C. § 301 (1994 & Supp. V). The MDA classifies devices in three categories depending on, *inter alia,* the controls deemed necessary to provide reasonable assurance of their safety and effectiveness. Class I devices are those which pose no unreasonable risk of illness or injury and therefore require only general controls. 21 U.S.C. § 360c(a)(1)(A). Class II devices are those with a greater potential dangerousness and thus warrant more stringent controls. 21 U.S.C. § 360c(a)(1)(B). Class III devices are those which are "for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health" or "present[ ] a potential unreasonable risk of illness or injury", and for which there is not sufficient information to provide reasonable assurance of the device's safety and effectiveness under the general or special controls under Class I or II. 21 U.S.C. § 360c(a)(1)(C).

█ Class III devices warrant the FDA's heaviest regulation and must undergo a premarket approval ("PMA") process before they may be commercially distributed. *Buckman Co. v. Plaintiffs' Legal Committee,* 531 U.S. 341, 121 S.Ct. 1012, 1015, 148 L.Ed.2d 854 (2001).[2] The PMA process entails a thorough review in which the manufacturer must demonstrate a "reasonable assurance" that the device is "safe ... [and] effective under the conditions of use prescribed, recommended or suggested in the proposed labeling thereof." *Id.* (*citing* 21 U.S.C. §§ 360e(d)(2)(A), (B)). Two exceptions exist to the PMA process. First, "predicate" devices (i.e., those which were on the market prior to the MDA's enactment in 1976) may remain available until the FDA initiates and completes the PMA process. *Buckman,* 121 S.Ct. at 1015–16. Second,

---

**2.** Amici Curiae The American Medical Association, The Pennsylvania Medical Society and Medtronic Sofamor Danek Inc. have filed an Application for leave to make a post-argument submission, referring the court to *Buckman, supra.* In an order in conjunction with this opinion, we grant the Application.

"[I]n order to avoid the potentially monopolistic consequences of this predicate-device exception, the MDA allows other manufacturers to distribute (also pending completion of the predicate device's PMA review) devices that are shown to be 'substantially equivalent' to a predicate device." *Id.* at 1016 (*citing* § 360e(b)(1)(B)).

Apart from the FDA's labeling requirements, doctors sometimes employ medical devices for an "off-label" use, i.e., for a purpose other than those which appear in the labeling and which have been approved by the FDA. *See* Notice, 59 Fed. Reg. 59820, 59820 (1994). The FDA does not preclude off-label use of medical devices. To the contrary, while the FDA regulates the marketing and labeling of medical devices, it does not purport to interfere with the practice of medicine. *See* 21 U.S.C. § 396 (1994 ed.   & Supp. V) ("Nothing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship."). The United States Supreme Court recently recognized that off-label use "is an accepted and necessary corollary of the FDA's mission to regulate in this area without directly interfering with the practice of medicine." *Buckman*, 121 S.Ct. at 1018 (*citing* James. M. Beck and Elizabeth D. Azari, *FDA, Off-Label Use, and Informed Consent: Debunking Myths and Misconceptions*, 53 FOOD AND DRUG L.J. 71, 76–77 (1998)). In the case of bone screws, "[b]y mid 1992, [the] FDA discovered that the use of pedicle screw spinal systems outside of approved [investigational device exemption] studies was widespread, and that pedicle screw fixation was considered to be the standard of care by the surgical community." Proposed Rule, 60 Fed.Reg. 51946, 51947 (proposed Oct. 4, 1995).[3]

3. The parties dispute the appropriate classification of the device at issue, the "TSRH System". Appellees contend that the TSRH System was sold as a Class II device, but that this classification was specific to an intended use in long bones, such as tibias and femurs. Appellants claim that the TSRH System was a Class II device approved for use in the spine, specifically, the ilium and the sacrum, but never for use in

In 1996, Appellees' case was transferred to the Court of Common Pleas of Philadelphia County, where it became part of Pennsylvania's coordinated orthopedic bone screw litigation. Similar coordinated litigation was ongoing in the United States District Court for the Eastern District of Pennsylvania.

On March 8, 1996, in a Memorandum and Order issued jointly by the courts in both the federal and state coordinated litigations, the courts granted partial summary judgment to the physician defendants and dismissed with prejudice all informed consent claims alleging that the physicians were obligated to advise patients of the FDA regulatory status of the pedicle screw devices. *In re Orthopedic Bone Screw Products Liability Litigation*, 1996 WL 107556 (E.D.Pa. March 8, 1996), *reconsideration denied*, 1996 WL 900351 (E.D.Pa. May 21, 1996) (*"Bone Screw Litigation"*). The courts found that examples of "risks" included "internal bleeding, paralysis, or neurological damage." *Id.* at *3. The courts further recognized that the FDA does not regulate the practice of medicine, and therefore the "decision whether or not to use a drug for an off-label purpose is a matter of medical judgment[,] not of regulatory approval." *Id.* (*quoting Klein v. Biscup*, 109 Ohio App.3d 855, 673 N.E.2d 225 (1996), *appeal denied*, 76 Ohio St.3d 1438, 667 N.E.2d 987 (1996)). The courts reasoned that the FDA labels given to a medical device do not speak directly to the medical issues surrounding a particular surgery. *Id.* The courts concluded that the terms "Class III", "investigational" and "significant risk" device were terms used by the FDA for administrative or regulatory

long bones. Appellants further claim that in Appellee's case, four bone screws were utilized, bilaterally in the sacrum (S 1) and the lowest lumbar vertebrae (L 5), and thus the two lower screws would be considered a cleared Class II use by the FDA, while the two higher screws would be considered an "off-label" use. Despite this discrepancy, both parties indicate that when the screws were used in the pedicles of the portion of the spine at issue here, they were designated as a Class III device. Thus, for purposes of this opinion, we will refer to the bone screws as a Class III device. Parenthetically, we note that on July 27, 1998, nearly six years after Appellee's surgery, the FDA classified certain previously unclassified pedicle screw spinal systems into Class II and reclassified other pedicle screw systems from Class III to Class II for certain intended uses. *See* Rules and Regulations, 63 Fed.Reg. 40025 (1998).

purposes, and were not "risks" of a surgical procedure. *Id.* at *5, 667 N.E.2d 987. By virtue of the inclusion of Appellees' case in the consolidated litigation, the March 8, 1996 order applied to Appellees' informed consent claims against Appellants.

Thereafter, the trial court precluded Appellees from introducing evidence that Appellants never informed Branes Southard of the FDA regulatory status of the bone screws and rods. A jury trial commenced on Appellees' negligence claims and a remaining informed consent claim. The jury returned a verdict in favor of Temple University Hospital and Appellants as to the negligence claims, and to Appellants as to the informed consent claim. The trial court denied Appellees' post-trial motions.

On appeal, the Superior Court reversed the order granting partial summary judgment in favor of all physicians and vacated the judgment in favor of Appellants on the informed consent claim regarding the FDA regulatory status. The court remanded the matter for a new trial on that claim.[4] Appellants' application for reargument/reconsideration was denied, and this appeal followed.

Our review on an appeal from the grant of a motion for summary judgment is well-settled. A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. *Capek v. Devito,* 564 Pa. 267, 767 A.2d 1047, 1048 n. 1 (2001). As this appeal presents a question of law, our review is plenary. *Phillips v. A–Best Products Co.,* 542 Pa.

---

4. The Superior Court also vacated the judgment in favor of Appellants on a second informed consent claim based on Appellants' failure to inform Appellee of the risk of explantation; affirmed the judgment in favor of Temple University Hospital on the informed consent claims; and affirmed the judgments in favor of Temple University Hospital and Appellants with respect to the negligence claims. In addition to remanding the case for a new trial on the informed consent claim regarding the FDA status of the bone screws, the court also remanded for a new trial on Appellee's second informed consent claim. Because allocatur was limited to the issue regarding the need to disclose a device's FDA status, we express no opinion on the Superior Court's other rulings.

124, 665 A.2d 1167, 1170 (1995). Furthermore, summary judgment may be granted only in those cases in which the record clearly shows that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *P.J.S. v. Penn. State Ethics Comm'n*, 555 Pa. 149, 723 A.2d 174, 176 (1999).

▮▮▮▮ In a claim alleging lack of informed consent, it is the conduct of the unauthorized procedure that constitutes the tort. *Moure v. Raeuchle*, 529 Pa. 394, 604 A.2d 1003, 1008 (1992). We have recently reaffirmed that the doctrine of informed consent requires doctors to provide patients with "material information necessary to determine whether to proceed with the surgical or operative procedure or to remain in the present condition." *Duttry v. Lewis T. Patterson, M.D.*, 771 A.2d 1255, 1258 (Pa.2001) (*quoting Sinclair by Sinclair v. Block*, 534 Pa. 563, 633 A.2d 1137, 1140 (1993)). The information imparted must give the patient "a true understanding of the nature of the operation to be performed, the seriousness of it, the organs of the body involved, the disease or incapacity sought to be cured, and the possible results." *Id.* (*quoting Gray v. Grunnagle*, 423 Pa. 144, 223 A.2d 663, 674 (1966)). This court has not required the disclosure of *"all* known information." *Gouse v. Cassel*, 532 Pa. 197, 615 A.2d 331, 334 (1992) (emphasis added). We require only that doctors "advise the patient of those material facts, risks, complications and alternatives to surgery that a reasonable person in the patient's situation would consider significant in deciding whether to have the operation." *Id.* (emphasis omitted).[5, 6]

5. In a similar vein, the legislature defined "informed consent" at the time of Appellee's surgery as follows:

"Informed Consent" means ... the consent of a patient to the performance of health care services by a physician....: Provided, That prior to the consent having been given, the physician ... has informed the patient of the nature of the proposed procedure or treatment and of those risks and alternatives to treatment or diagnosis that a reasonable patient would consider material to the decision whether or not to undergo treatment or diagnosis....

40 P.S. § 1301.103 (1992).

6. Appellees contend that the trial court in this case displaced the function of the jury by finding that the FDA status was not material in

■ In this case, the Superior Court did not dispute the fact that the FDA did not prohibit off-label use and that the use of bone screws may be the standard of care in the surgical community. Nonetheless, the court found that these facts did not yield the conclusion that the FDA classification need not be disclosed to ensure informed consent. The Superior Court reasoned that the FDA's Class III classification constitutes a conclusion by the FDA that the screws have at least unknown characteristics, which are clearly "risks". Specifically, the Class III certification was a determination that there was insufficient evidence of safety and effectiveness to warrant FDA approval. Even if these unknown characteristics are not "risks", the court continued, they nevertheless qualified as "facts" regarding the surgical procedure, which directly address the medical issues of a particular surgery. The court found that a reasonable person, if adequately informed, might opt for a more conventional FDA-approved mode of treatment, and concluded that at the least, an issue of fact remained for the jury.[7]

We see no reason to expand the information that surgeons traditionally impart to their patients to encompass a device's FDA regulatory status. We agree with the courts in *Bone Screw Litigation* that "[t]he FDA labels given to a medical device do not speak directly to the medical issues surrounding a particular surgery". 1996 WL 107556 at *3. The category into which the FDA places the device for marketing and

an informed consent claim. While as a general rule it is the province of the jury to decide whether certain information is material to a patient's decision, *see Moure*, 604 A.2d at 1008 (Pa.1992), in certain cases, it is proper for the court to make that determination as a matter of law. *See Duttry, supra* (concluding that the personal attributes or experience of the physician are irrelevant to an informed consent claim).

7. The Superior Court also rejected Appellants' arguments that the Class III certification was not controlling because the classification occurred because of an "automatic statutory default" after the FDA denied a manufacturer's request to treat the screws as substantially equivalent to a device with a Class I or Class II classification; that the FDA recognized, subsequent to Appellee's surgery, that bone screws should be reclassified as Class II devices; and that physicians are not qualified to discuss FDA regulations with their patients. Because we agree with Appellants that the Superior Court erroneously interpreted the import of the FDA status, we do not address these additional arguments.

labeling purposes simply does not enlighten the patient as to the nature or seriousness of the proposed operation, the organs of the body involved, the disease sought to be cured, or the possible results. The FDA administrative label does not constitute a material fact, risk, complication or alternative to a surgical procedure. It follows that a physician need not disclose a device's FDA classification to the patient in order to ensure that the patient has been fully informed regarding the procedure. *Accord Alvarez v. Smith,* 714 So.2d 652 (Fla. App.5 Dist.1998); *Klein, supra.*

Appellees rely on the Superior Court's conclusion that the Class III determination means that there is insufficient information regarding the device's safety and effectiveness, which in turn meant that the screws have "unknown consequences", which are "risks" or "facts" regarding the surgical procedure. We disagree that these "unknown consequences" in the context of an FDA review equate to "risks" or "facts" pertinent to the informed consent inquiry. The fact that the FDA had not yet garnered sufficient information in its review process to conclude that there is a reasonable assurance of safety to classify the screws for a particular use is not a qualitative determination that the device is risky or unsafe. *See Holland v. Smith & Nephew Richards, Inc.,* 100 F.Supp.2d 53 (D.Mass. 1999) ("The mere fact that the FDA has not cleared a product for a particular use does not mean that the product is not in fact suitable for that purpose; it simply means that the FDA has not cleared it."); *Minisan v. Danek Medical, Inc.,* 79 F.Supp.2d 970 (N.D.Ind.1999) (fact that FDA has not approved device for a particular use does not mean that it is unsafe or defective) (citation omitted). Indeed, the FDA has specifically refuted the claim that it ever determined "that pedicle screw spinal systems present a serious risk of injury." 63 Fed.Reg. 40025, 40031 at ¶ 8.

We also reject Appellees' suggestion that a device's FDA classification must be divulged to parties merely because the purpose of the MDA was to enhance patient safety and safeguard the recipients of medical devices. *See Medtronic, Inc. v. Lohr,* 518 U.S. 470, 474, 116 S.Ct. 2240, 135 L.Ed.2d

700 (1996) (MDA of 1976 was enacted "to provide for the safety and effectiveness of medical devices intended for human use") (*citing* 90 Stat. 539). This general policy of safety alone does not answer the specific inquiry here, namely, whether the FDA status is a material fact, risk, complication or alternative of a particular surgical procedure.

Appellees further rely on a line of cases involving clinical investigations which are conducted pursuant to FDA regulations ("Investigational Device Exemptions", or "IDEs").[8] The FDA permits such investigations in order to encourage the discovery of useful medical devices. 21 U.S.C. § 360j(g); 21 C.F.R. Part 812. In turn, physicians who participate in an IDE voluntarily agree to abide by numerous procedures, including obtaining a patient's informed consent of the proposed clinical testing. 21 U.S.C. § 360j(g)(3)(D); 21 C.F.R. § 50.20 *et seq.* Appellee was not a patient in one of these investigations. Appellees argue that surgeons who perform "experimental surgery" outside of these FDA-monitored investigations should not be held to a lesser standard of disclosure; rather, they too should be required to disclose the "investigational nature of the procedure". Appellees' Brief at 39–40.

Appellees improperly equate the two situations. Merely because a device is deemed "investigational" for purposes of an IDE does not establish that the device is "experimental" or "investigational" for all medical purposes.[9] In fact, as in the

8. Appellees cite the following cases: *Gaston v. Hunter*, 121 Ariz. 33, 588 P.2d 326 (1978) (clinical investigation involving injectable drug); *Daum v. SpineCare Medical Group*, 52 Cal.App.4th 1285, 61 Cal.Rptr.2d 260 (1997) (clinical investigation regarding Wiltse II spinal fixation device); *Kus v. Sherman Hosp.*, 268 Ill.App.3d 771, 206 Ill.Dec. 161, 644 N.E.2d 1214 (1995), *appeal denied*, 162 Ill.2d 569, 209 Ill.Dec. 803, 652 N.E.2d 343 (1995) (clinical investigation involving intraocular lens); *Niehoff v. Surgidev Corp.*, 950 S.W.2d 816 (Ky.1997) (same), *cert. denied*, 523 U.S. 1005, 118 S.Ct. 1187, 140 L.Ed.2d 317 (1998); *Friter v. Iolab Corp.* 414 Pa.Super. 622, 607 A.2d 1111 (1992) (same); *Baker v. Myers*, 700 A.2d 1021 (Pa.Super.1997) (unpublished memorandum opinion).

9. We recognize that the federal district court in *Corrigan v. Methodist Hospital*, 869 F.Supp. 1202 (E.D.Pa.1994), determined that the FDA regulatory status was relevant to an informed consent claim. The plaintiff's expert in *Corrigan* opined that the screws were "investigation-

case of bone screws, the prevailing standard of care may dictate the opposite conclusion. We therefore decline to subject those physicians who do not voluntarily participate in FDA clinical investigations to the purview of the FDA's requirements for such investigations.

Finally, Appellees rely on the legislature's passage of 40 P.S. § 1301.811–A, which requires a physician to obtain a patient's consent prior to, *inter alia,* "[a]dministering an experimental medication, using an experimental device or using an approved medication or device in an experimental manner." 40 P.S. § 1301.811–A(a)(5). Appellees contend that the statute is consistent with the informed consent requirements that they advocate. However, section 1301.811–A was enacted after Appellee's surgery and is inapplicable to the current case.[10]

■ Thus, we hold that a physician need not inform patients of the FDA classification of a medical device. We reverse that portion of the Superior Court's order that reversed the order granting partial summary judgment in favor of all physicians regarding the informed consent claim based on a failure to disclose the FDA classification of bone screws. In its disposition, the Superior Court remanded this case for a new trial on Appellee's remaining informed consent claim

al, meaning that they had not been proven to be safe and effective." *Id.* at 1207. The court in *Corrigan* concluded that use of the screws in surgery was a surgical risk that a jury may find to be material. *Id.* n. 3. Like the courts in *Bone Screw Litigation,* we are not persuaded by the reasoning in *Corrigan.*

10. None of the other cases cited by Appellees compels a different result. In *Shadrick v. Coker,* 963 S.W.2d 726 (Tenn.1998), the court addressed a statute of limitations issue, and adopted the appellant's assertion that the use of bone screws was "experimental" without engaging in any meaningful analysis of that term. In *Retkwa v. Orentreich,* 154 Misc.2d 164, 584 N.Y.S.2d 710 (N.Y.Sup.Ct.1992), the court determined in a conclusory manner that the FDA status of an unapproved injectable drug was relevant, analogizing to *Gaston, supra,* which involved a clinical investigation. The court in *Stover v. Ass'n of Thoracic & Cardiovascular Surgeons,* 431 Pa.Super. 11, 635 A.2d 1047 (1993), addressed an informed consent claim arising from implantation of a heart valve, but never discussed the device's FDA regulatory status. Finally, *Cosom v. Marcotte,* 760 A.2d 886 (Pa.Super.2000), followed the Superior Court's reasoning in *Southard,* which we reject today.

(alleging the failure to advise Appellee of the risk of explantation) as well as the informed consent claim alleging a failure to advise Appellee of the FDA regulatory status of the bone screws. In light of our decision today, Appellee is precluded from pursuing the latter claim. The case is remanded for proceedings consistent with this opinion. Jurisdiction relinquished.

Justice NEWMAN did not participate in the consideration or decision of this matter.

Justice SAYLOR concurs in the result.